R & K CORPORATION, Respondent, *v.* KENMONT HAT CO., INC., Appellant.

First Department, June 12, 1956.

*Simon Rosenzweig* of counsel (*Morris Fish* with him on the brief; *Callman Gottesman,* attorney), for appellant.

*Jacob W. Friedman* of counsel (*Safir & Kahn,* attorneys), for respondent.

VALENTE, J.  Landlord sued a statutory tenant in contract and recovered a judgment for damages in the amount of $4,533.39, and obtained a dismissal of the tenant's counterclaim.  The tenant appeals to this court from said judgment. There does not appear to be any serious dispute as to the facts.

In December of 1953 the landlord was the owner of a loft building.  The tenant occupied the front third of the 15th floor of said premises at a rental of $4,800 per annum.  There were two other tenants on the floor, namely, Original Pleating Co. and the Commodore Hat Co., a decontrolled tenant.  The landlord gave notice of its intention to occupy that floor for a dress business it owned or controlled.  Negotiations were immediately initiated by one of the tenants for the purpose of inducing the landlord to discontinue its eviction plans.  The landlord was persuaded to forego its plan to take over the floor upon the assurance of the defendant tenant and the hat company that it would receive an income of $20,000 per annum from that floor for a three-year period.  Thereupon a tripartite oral agreement was concluded whereby the defendant tenant and the hat company would divide the floor equally between them and they and the landlord would contribute to a payment of $9,000 to be made to the third tenant, Original, to induce it to move out. This payment was shared as follows: $1,000 was paid by the tenant — which was the subject of tenant's counterclaim; $2,000 was paid by the hat company; and the balance of $6,000 was paid by the landlord.  In due course this sum of $9,000 was paid to Original.

When the defendant tenant indicated that it did not desire to take the additional space, the understanding was modified and, in accordance therewith, tenant retained its original space

but executed a lease for a three-year period commencing January 1, 1954. Provision was made for a new reasonable rent of $8,000 per annum and there was the customary clause giving the tenant the option to cancel and return to the emergency rental of $4,800 if exercised within 60 days, all as required by the Commercial Rent Law (§ 4, subd. 3, par. [iii]; L. 1945, chs. 3, 315, as amd.). At the same time a separate lease for the remainder of the floor was executed by the hat company for a period commencing April 1, 1954 and ending December 31, 1956, at a rental of $12,000 per annum. The leases are dated December 24, 1953, and as of the date of the execution thereof the agreement of the parties was a fait accompli.

On January 26, 1954 — and before it had paid any rent under the new lease — the tenant availed itself of the cancellation privilege and notified landlord that it was canceling the lease and the reasonable rent agreement and was reverting to the status of statutory tenant at the $4,800 per annum rental.

The landlord then sued and alleged the existence of an oral agreement and a breach by the tenant after receiving the full benefit of performance by the landlord. The breach alleged was the failure of tenant to make the monthly payments of the additional rental and the damage claimed was the commuted value of $8,825.14 for the three-year period.

The court below found for the landlord on a quasi-contractual theory and held that tenant was liable for the difference between the emergency rental of $4,800 and the reasonable rental of $8,000 per annum fixed in the cancelled lease for the three-year period, limiting the recovery, however, to the monthly installments that had accrued through May 1, 1955.

The tenant predicates its appeal on the contention that the prior oral agreements were merged and integrated into the reasonable rent agreement and the lease executed by the tenant and the landlord and that the Commercial Rent Law bars recovery.

We do not subscribe to these contentions nor to the quasi-contractual theory of recovery relied upon by the court below. We find in fact and in law there existed a valid oral agreement between the landlord and the tenant capable of performance within the period of one year.

Under this agreement the landlord agreed to and did (1) abandon its attempt to acquire the premises for its own use and to evict the tenants therefrom; (2) pay $6,000 to Original to induce it to move so that the defendant and the remaining tenant could have the floor to themselves; and (3) give them each the security of a three-year lease. The defendant tenant for its part agreed to and did (1) pay $1,000 towards inducing Original to move;

(2) together with Commodore, the other tenant, take over the entire 15th floor; (3) assure the landlord the payment of the sum of $60,000 for the period of guaranteed possession — an amount which " would economically justify abandonment of the plan to move "; and (4) execute a lease agreeing to a new " reasonable rental " which, together with the lease executed by the remaining tenant, included the additional sums promised the landlord in installments " as rent ".   All these acts — the payment to Original and the agreement to execute a new lease guaranteeing the landlord an amount sufficient to induce him to refrain from eviction — could be performed and were in fact performed within the one-year period.   Hence the Statute of Frauds does not apply.

The promise by the tenant in exchange for the guarantee of uninterrupted possession for three years to execute a new lease and reasonable rent agreement was part of the oral agreement but not the whole of it.   The lease was merely one of the means by which the oral agreement was to be implemented.   It provided the mechanics by which the additional consideration to the landlord was to be paid.   Execution of the lease did not effect a merger, the lease not being as broad in scope or comprehensive in terms as the oral agreement.   There was in effect a settlement of the contemplated eviction proceeding, the amount of the settlement to be paid in monthly installments " as rent ", with the tenant executing a certificate of reasonable rental to comply with the rent control laws.   There was no circumvention of the rent control laws, for the tenant agreed to execute an agreement of reasonable rental in exchange for the detriment incurred by the landlord in abandoning its plans to move in.   The right to cancel the agreement of reasonable rental was vouchsafed to the tenant by the Commercial Rent Law, and the tenant legally exercised that right.   However, there is no basis or right to expand and read into this provision to cancel a provision for cancellation of the underlying oral agreement as well.   The exercise of the right to cancel by the tenant could no more relieve it of the basic obligation to pay the amount of the settlement orally agreed upon than would its refusal to execute the lease in the first instance.   Because of the cancellation, the amount of the settlement may no longer be payable " as rent ", but it is still payable, albeit in another form.

The breach asserted in the complaint is not the cancellation of this lease by the tenant but the violation of the underlying oral agreement which contemplated that the landlord would receive $20,000 rental a year for the three-year period in consideration of abandoning its plan to use that floor and for its

paying $6,000 to Original. Because of the tenant's action in canceling the lease the landlord presently finds itself in the position where it cannot occupy the floor until January 1, 1957 — the date of the expiration of the lease with the hat company — and instead of receiving a rental of $20,000 per annum that "would economically justify" abandonment of its plan to take over the floor it will only receive $16,800 per annum for the three-year period. This is not conscionable and the tenant is solely responsible for the predicament in which the landlord presently finds itself.

Inherent in the findings of the lower court is the good faith of the landlord in all of the negotiations. There is no error in this finding or in the other findings of fact of the court below.

The tenant is properly liable to the extent in which it failed in its assurance to the landlord, namely, $9,600 for the three-year period. This represents the difference between the $60,000 landlord was to have received under the agreement with the defendant tenant and the hat company and the sum of $50,400 it will presently receive. This damage of $9,600 flows naturally and directly from the breach of the oral agreement by the tenant and is attributable to the tenant. Since the landlord was to receive this $9,600 in installments over the three-year period, he is entitled to recover only the commuted value thereof in the sum of $8,825.14. This case was tried before the court without a jury and in accordance with the provisions of subdivision 2 of section 584 of the Civil Practice Act the judgment is increased to that amount.

The judgment should be modified to the extent of increasing it to the sum of $8,825.14 with interest from January 1, 1954, and in all other respects should be affirmed.

BERGAN, J. (dissenting). The complaint fails to state any actionable cause of any kind. Although in the course of trial the plaintiff proceeded on theories which differed widely from those pleaded, arising from the proof as it developed, the complaint itself is suggestive of the marked infirmities of the grounds for relief upon which plaintiff relies to sustain this judgment, and the pleading ought to be examined as part of the frame in which this litigation is cast.

The nature of the contract as pleaded is that the plaintiff, R & K Corporation, the defendant, Kenmont Hat Co., Inc., and Sidney Simner, doing business as Commodore Hat, entered into an agreement. The obligations of each of the parties to the agreement are set forth in the complaint as follows: plaintiff was to "procure" that Samuel Cohen, doing business as Original Pleating Co., was to give up his space on the 15th

floor of the building owned by plaintiff for the sum of $9,000; that plaintiff was to " contribute " $6,000 " thereto "; that defendant was to pay plaintiff $10,600, all but $1,000 of which was to be paid monthly over a period of three years " as if the same were an addition to the defendant's rent "; and that Simner would undertake " to give a valuable consideration " to the plaintiff.

The consideration, if any, which moved defendant to agree to pay plaintiff $10,600 is not disclosed. No benefit, either in the way of larger space or otherwise is pleaded to have been intended to pass on to defendant in support of its promise to pay money. Under the pleading as it is to be read literally, defendant got nothing for agreeing to pay $10,600; whereas plaintiff pleads that it was to receive back not only the $6,000 which it was to " contribute " to the fund to induce Original to move, but was to receive $4,600 more and the " valuable consideration " which was to be paid plaintiff by Commodore. Thus, as pleaded, the agreement was unenforcible because of the absence of any consideration pleaded to have passed to the defendant. We have disclosed, merely, a naked agreement by the defendant to pay money.

The complaint contains some generalized conclusions of law hinting at benefit to the defendant; but certainly no facts are pleaded to disclose what such benefits might be. It is alleged, for example, in that part of the complaint dealing with the repudiation of the agreement by defendant, that the repudiation was " after receiving the full benefit of the performance by the plaintiff aforesaid ". What these legally conclusory words may mean is not demonstrated.

In that part of the complaint setting up damage it is said, again in the words of legal conclusion, and without pleading any fact, that defendant had become " justly indebted " to the plaintiff " by reason of the aforesaid undertaking and of the receipt of the said benefits furnished to the defendant by the plaintiff, at the request of the defendant ". A careful sifting of the pleading casts no light on what such benefits might possibly be.

The course of proof upon the trial departed radically in direction from the tenuous theories tendered by the complaint; but if the relationships of the parties as disclosed by this proof thus became more intelligible, the proof also disclosed a series of oral undertakings which in the end became merged fully in a formal written instrument setting forth all the respective rights and duties of plaintiff and defendant to each other in relation

to the subject matter in controversy in clear and simple written words.

The proof on the trial, accepting fully the view of the evidence most favorable to plaintiff, is to the effect that in the fall of 1953 the defendant, Kenmont, Original Pleating, and Commodore Hat occupied the 15th floor of the building owned by the plaintiff. Defendant was a statutory tenant, paying $4,800 annual rent. Plaintiff sent a notice to defendant that it desired to use the premises occupied by defendant for its own use. A similar notice was sent to Original which had a similar statutory tenancy. Commodore was a decontrolled tenant.

This notice to the controlled tenants from the plaintiff as landlord precipitated discussions in which the defendant and Commodore and Original considered paying the "moving expenses" of Original's vacating its space on the floor, and defendant and Commodore dividing up the space thus made available.

It is of interest to consider the nature of the understanding between the plaintiff and the defendant which followed upon these discussions; to evaluate what kind of an agreement or "contract" it was; and what was done with it. The proof as adduced by the plaintiff on the nature of the understanding emerging from the conversations immediately following plaintiff's notice to the tenants that it wanted the space for itself does not fall within any theory of action to be read in the complaint.

If every deduction and inference favorable to the plaintiff be accepted, the proof shows this: plaintiff and defendant agreed on December 22, 1953, that the defendant would take one half the space to be vacated by Original; that defendant would pay $1,000 toward the removal expense of Original; and that plaintiff would give the defendant a lease for the space it then occupied and the additional space comprised of one half that occupied by Original for a period of three years beginning April 1, 1954, at a rental of $10,500 a year in place of the $4,800 emergency rental for the space then occupied by defendant.

Commodore was to take the other half of the space of Original and Commodore was to pay $2,000 toward Original's moving expense, while the plaintiff was to pay $6,000 of that expense, making a total of $9,000 to induce Original to vacate its space.

This is plaintiff's own proof. Nathaniel Feuer, the real estate broker who managed these premises for plaintiff and who handled all the negotiations with the defendant testified that his oral proposal of an agreement to the defendant's president, Isidor Herman, was that "if he agreed to pay $11,000 for the space indicated on the plan" as "rent" and if he "let the

thousand dollars ride that he originally agreed to pay  *  *  * towards the moving expense  *  *  *  I would try to induce the owner to put up the balance of the money '' to induce Original to move.  This balance, he said, was $6,000.

The response of defendant's president to this oral offer was described by Mr. Feuer as follows: '' Mr. Herman didn't want to pay the $11,000, but he did agree to pay $10,500 and he did agree to pay the thousand dollars, and he did agree to put up his own wall ''.  Mr. Feuer continued: '' I went to the landlord with this proposition and the landlord was agreeable to putting up the $6,000 ''.

This consent of the plaintiff having been obtained by the agent, he went back to the defendant's president and said to him: '' That we would make a lease with him for $10,500 for the space, continuing his easterly wall, and we would give him a lease for a period ending December 31st, 1956, and he was to pay the thousand dollars towards the moving expense for Original Pleating.''  The lease was to begin '' From the time that Original Pleating moved from their premises ''.  A similar conversation was had with a representative of Commodore, but provided for somewhat lower rental.

The same day as this conversation, December 22, 1953, defendant paid plaintiff the sum of $1,000 by check.  The next day '' or the day after '' the defendant's president had a further conversation with Mr. Feuer, the plaintiff's agent, who testified: '' Mr. Herman told me that he did not want to go ahead with the $10,500 deal, he wanted to be released from that transaction, he couldn't afford that rental, and he didn't want to spend that much and wanted to be released  *  *  *  I told him that I had spent a great deal of effort in inducing the owner to contribute the major portion of the amount to be paid to Original Pleating, and it was paid on the strength of that lease, and it left me in an embarrassing position if he wasn't going ahead with this deal and I couldn't release him from that transaction unless it was possible to make a deal so that the total rental for the floor would equal the amount at least that we were to get from the two tenants under the first agreement  *  *  * He was not interested in going ahead with the deal and wanted to be released.''

The statement by Mr. Feuer that on December 23, 1953, or the day after the amount that plaintiff had agreed to '' contribute '' toward the moving expenses of Original '' was paid '' on the '' strength of that lease '' was not accurate.  No money had then been paid by plaintiff.  No binding agreement existed between plaintiff and Original for the payment of any sum for

removing at that time; and it was not until several weeks later, on January 14, 1954 that the plaintiff signed an agreement to pay Original $9,000 " in consideration for his removal from the said premises " and the money was not actually paid until March 31, 1954.

It will be seen, therefore, that at the time the agreement of December 22, 1953, was made between plaintiff and defendant and at the time it was cancelled the next day or the day after, it was an agreement coming within the Statute of Frauds. The agreement described in the oral discussions of the parties was for a lease of real property for a period well in excess of one year; and while plaintiff had orally agreed to pay $6,000 toward the $9,000 expense of removal in exchange for the defendant's oral promise to undertake a lease, that agreement, the only support of which was an agreement within the statute, likewise fell, and was not partially or otherwise performed by the plaintiff until long after the defendant had rescinded its oral agreement.

That defendant had performed one step of its agreement by paying $1,000 to plaintiff does not help plaintiff. Upon renunciation of the agreement unenforcible under the Statute of Frauds, the party so renouncing will sometimes not be permitted to undo the part he has performed; but it is not easy to understand upon what possible theory the plaintiff could enforce an oral agreement to make a lease which was to run over a year upon consideration of plaintiff's unperformed, and then wholly unenforcible, oral agreement to pay money in the future. Thus defendant could not possibly have incurred an additional liability in renouncing an agreement, the enforcement of which was barred by the Statute of Frauds.

Even if we were to take quite a different view about it and hold that the parol undertakings to make a lease for three years in the future and for the plaintiff to help pay for the removal of Original by making an agreement to do so in the future was an enforcible contract, it is apparent that this contract was abandoned by the mutual agreement of both parties and an entirely new undertaking entered upon.

This becomes perfectly clear from the discussion of counsel at an early stage in the trial when objection was made by defendant to the reception of evidence of conversations on the ground that all of the conversations of the parties had become merged in a written agreement on December 24, 1953. In response to this, counsel for plaintiff made a statement of plaintiff's position on the trial. Addressing the court, he said: " Our cause of action is predicated on the fact that thereafter,

after this conversation, an oral agreement was made, and as a consideration for other things we released him of that oral agreement, and then entered into a second agreement.'' That it was the intention of the parties to substitute an entirely different and '' second '' agreement in the place of the one agreed to orally on December 22, 1953, is abundantly suggested by the evidence adduced by plaintiff itself and permeates large segments of the record in this case.

This '' second agreement '' referred to by counsel was described in very specific words by Mr. Feuer, who continued to handle negotiations for plaintiff with defendant. Mr. Feuer, after defendant renounced the first oral arrangement, induced Commodore to take over all of Original's space for an annual rental of $12,000 including the space which Commodore had formerly occupied. Then he went back to defendant's president and told him that if he would pay $8,000 for the space that he then occupied, Feuer could '' induce the owner '' to '' make the deal.''

It ought to be noticed that this '' deal '' was an increase in the rent of defendant as a statutory tenant which almost doubled it from $4,800 a year to $8,000 a year for exactly the same space. Nothing was said by either participant in these conversations that this was to be in consideration of '' releasing '' defendant from its previous agreement.

It is perfectly clear also that the parties were talking then not about some theory of satisfying the landlord for an amount of money it had paid out in reliance upon defendant's agreement, or in adjusting some obscure legal rights or vagrant equities. They were talking about a matter plainly understood by both sides, namely, a lease of real property, because Mr. Feuer said that when he made this proposal to defendant, defendant's president said: '' It is O.K., draw your lease.''

In immediate context and in the same vein, Feuer's testimony continued: '' His tenancy was to begin the 1st of the subsequent month, which was January 1st, 1954, because it did not involve any different space, no change in the space itself.''

These oral understandings of agreement between the parties led immediately and directly to the making of a written instrument between them, subscribed with due formality and which swept within its terms the pertinent and relevant undertakings between the parties in respect of the '' tenancy,'' the '' space,'' the '' rental '' and the '' deal ''— all those things they had been talking about.

The instrument recited that it was an '' Agreement Of Lease '' made between plaintiff and defendant December 24, 1953 on the

standard form of loft lease. It ran for three years from January 1, 1954, to December 31, 1956, at an annual rental of $8,000; described the premises that defendant had been occupying as statutory tenant, and recited that the parties agreed to the sum of $8,000 as the reasonable rental "pursuant to Section 4 of the New York State Emergency Rent Control Laws". The instrument contained the recital that "this lease contains the entire agreement between the parties."

But the writing contained another significant provision. It imposed a proviso of optional right on the agreement that $8,000 was to be the reasonable rent. This condition was that it "may be cancelled by the Tenant no later than February 24, 1954." It was further expressly agreed between the parties that if the tenant thus cancelled the agreement as to what was "reasonable rent" then "this lease shall simultaneously be cancelled and shall thereupon become null and void and of no effect as if the same had never been entered into."

It was further recited in a supplemental agreement forming part of the lease that the tenant "is desirous of entering into a lease with the Landlord" for the space described "notwithstanding any prior agreement made in connection with the premises"; that the "reasonable rent" is $8,000; that the tenant may within 60 days "cancel this agreement by notice to the Landlord" and that in the event of such cancellation "the Landlord shall have all the rights and remedies afforded to it under * * * New York Statute."

It has already been seen that the earlier agreement by oral discussions for the payment by the plaintiff of the removal expenses of Original and the enlargement of space to be occupied by the defendant, all in executory stage, came within the Statute of Frauds. The superseding oral agreement under which the defendant was to pay a higher rental for three years for the same space it had been occupying as a statutory tenant was certainly within the Statute of Frauds; and it can scarcely be argued that this agreement would have been enforcible against defendant in the absence of a writing. In such event the rights of the defendant to disaffirm such an oral agreement and to remain as statutory tenant at $4,800 a year would not have been open to the slightest doubt.

It is clear, therefore, that upon the cancellation of the lease in pursuance to its terms the defendant became what it had been during the discussions which had led to the making of the lease — a statutory tenant. The discussions, under familiar principles of law, merged in the written instrument and the

writing became the ultimate and binding expression of the undertakings by the parties.

This not only included the discussion of the new and superseding second oral agreement which expressed the intention of the parties to continue the old occupancy at a higher rate; but it also included the final form in which the earlier discussion of the parties as to a different space occupancy at a different rental had been under discussion. Not only is there the clear statement in the writing that its terms embrace "the entire agreement between the parties," but it fixes the reasonable rental and the rights flowing from it "notwithstanding any prior agreement made in connection with the premises."

It cannot fairly be argued, we think, that when parties discuss one disposition of rental properties between them and have a controversy about it; then discuss another disposition; and finally enter into a written agreement with respect thereto, that the ultimate writing is not fully binding against the force of the prior oral agreements touching on the same subject matter.

When defendant cancelled the oral understanding of December 22, 1953, plaintiff had no legal, equitable or even moral obligation to pay $6,000 to Original to vacate the space; and it had not then incurred an obligation to Original to pay. When it incurred that obligation to Original by written instrument in January, 1954, plaintiff knew that defendant had no interest in Original's space and it knew, of course, that defendant's lease had a cancellation option. Plaintiffs had derived such an increase in rental from Commodore for all the space Original had occupied that it considered it worthwhile for its own reasons to calculate and take whatever risk might exist that the cancellation option in the lease it had previously signed with defendant would be exercised. It entered into the agreement to be obligated to pay $6,000 to Original with this fact in clear sight.

It seems to be argued that plaintiff should somehow avoid and escape the force and effect of the right of defendant to cancel the lease for the new and higher "reasonable rental" because it was required by the Commercial Rent Law to include such a provision for cancellation in its lease with defendant.

Plaintiff was required to include the provision in the lease if it wanted to make the lease; but it certainly was not required to make a lease. If a right to sue defendant existed independently of the lease, it should not have signed the lease, but have sued upon the original parol agreement which it now seems to think would have been enforcible. It might then have pursued whatever remedy might exist; and, as it has been noted,

the complaint proceeds upon a theory which ignores the existence of the lease. The trouble with the theory is the hard fact that the written instrument does exist.

Of course, the formal written undertaking of the parties covering the subject matter of their prior parol explorations, and contemplating not only the premises involved in the conversations, but the very additional amounts of money talked about in the first place, cannot be ignored because a pleading fails to take note of it.

In the end, the parties put down all their undertakings in a formal writing; they did what they had not done in their oral explorations, provided for cancellation on notice; but this right superseded their conversations and now conclusively overrides the possibility they may have intended in their informal understandings that the lease for three years at $8,000 be absolute and noncancelable.

This certainly was the view of the controversy taken contemporaneously by plaintiff. When in pursuance to the terms of the lease defendant cancelled the agreement that $8,000 was to be the reasonable rental by a letter addressed to plaintiff, the plaintiff's agent, on February 5, 1954, acknowledged the letter of cancellation and did not dispute defendant's right to cancel.

On the contrary, plaintiff's agent accepted this as an unqualified right of defendant. '' As stated in your letter '' plaintiff's agent wrote defendant, '' the cancellation of the Reasonable Rent Agreement simultaneously cancels your lease  *  *  *  Consequently, your occupancy of the demised premises will be continued as a Statutory Tenant ''. This view is entirely consonant with the contention of defendant on the trial and on appeal. There was no contemporaneous thought of liability *indebitatus assumpsit* to be seen in this letter or in any of the dealings between the parties.

When the court at Trial Term reached the question of the merger of the prior oral agreements of the parties in the writing under the Statute of Frauds it held that the statute could not '' now be urged as a bar to recovery '' because this is an action '' for debt-restitution '' and a memorandum '' was actually executed.'' But the '' memorandum '' relied on and thus referred to was the lease of December 24 carrying with it the unconditional right of cancellation; and the '' debt restitution '' is expressed therein as the new '' reasonable rent '' clearly stated to be a substitute for statutory rent.

If the parties intended to write words about debt restitution instead of rent, they did not use any such words. The two authorities relied upon for this theory by the court at Trial

Term, and given a prominent place in the respondent's points filed with us, afford no support to any such theory. In the first one, *Harmon* v. *Peats Co.* (243 N. Y. 473), the court held on a pure question of pleading that while a bill of particulars amplifies a complaint, it does not have the same effect after an answer has been served, as an allegation in a complaint; and that a complaint, framed in double aspect, broad enough to permit recovery either on express contract or on *quantum meruit* would not be dismissed because of statement made in the bill of particulars, in the absence of an affirmative pleading of the Statute of Frauds and the Statute of Limitations in the answer. The other case relied on is *Pinner* v. *Leder* (115 Misc. 512, affd. 200 App. Div. 894) which holds merely that the Statute of Frauds must be affirmatively pleaded to be applied to an agreement purported to be affected by it.

The lease which here supersedes the oral conversations of the parties has some similarity to the agreement considered in *Laskey* v. *Rubel Corp.* (303 N. Y. 69, 71). There plaintiff and defendant had entered into an oral contract of employment. Plaintiff contended it was for a period of a year. The making of the agreement itself was conceded by the defendant; but a writing was produced by defendant, subscribed by plaintiff, which provided that " employment shall be terminable, at any time, at the option of the Company."

It was held, in full harmony with well-settled authority, that although the agreement for employment performable within a year would be a good enough contract in itself, it yielded to a writing subscribed by the party charged, as to any inconsistent provision; that as to an agreement partly oral and partly in writing, there is an " integration " with the parol covenants yielding to those in writing where inconsistent (p. 72). (See, also, 3 Williston on Contracts [rev. ed.], § 636, pp. 1830–1832.)

The formal making of a written lease merges conversations which led to its execution, especially as to matters closely touching on the landlord-tenant relationship such as services to be furnished to tenants in the nature of transportation to a subway station. (*Fogelson* v. *Rackfay Constr. Co.*, 300 N. Y. 334.) A formal provision for cancelability of an agreement to pay money, described in the pleading as " being in the nature of rent " merges and overrides any oral understanding that such payments, in connection with the occupation of premises and in the nature of rent, should be irrevocable.

Whatever the parties may or may not have agreed upon orally, and however valid such agreements may have been,

it is now fully overridden by their formal written undertaking (*Amend* v. *Hurley,* 293 N. Y. 587, 596). The merger was of " all prior or contemporaneous negotiations of the parties " (*Van Pelt* v. *Patchogue Citizens Bank & Trust Co.,* 259 App. Div. 1038).

These principles are indeed of universal application in common-law jurisdictions. The basic ground is described in broad terms in Corpus Juris Secundum (Vol. 17, Contracts, § 381) thus: " A rule of the common law, enacted into statute in some jurisdictions, is that in the absence of fraud a written contract merges all prior and contemporaneous negotiations on the subject, together with all prior oral contracts, and together with and including antecedent correspondence and prior written memorandum ". (See for example, in New York, *Thomas* v. *Scutt,* 127 N. Y. 133; *Matter of Lawyers Mtge. Co.,* 270 N. Y. 509; *Johnson* v. *Oppenheim,* 55 N. Y. 280, 292–293; *Ruppert* v. *Singhi,* 243 N. Y. 156, 159; *Mitchill* v. *Lath,* 247 N. Y. 377.)

Indeed, the rhetorical questions posed by Judge VANN in the *Scutt* case (p. 142) strike the issue here with special pertinency: " What ", he asks, " will be left of the rule if it is established that it does not control such a contract? Will anything of value be left if it is held that a writing which contains the full and definite terms of a contract, apparently complete, may be shown by oral evidence to be simply part performance of an entire verbal agreement previously made? "

Entirely aside from the consideration that to permit plaintiff to recover here the amount which the parties had fixed as " reasonable rent " under a statutory permission cancelable by force of the same statute, would do violence to the protection afforded by the Commercial Rent Law and require the tenant to pay a rental, by whatever name the payment may be called, almost twice the statutory rent, it seems reasonable that the rights of the parties should be governed according to the tenor of their formal written words.

The judgment should be modified by dismissing the complaint and otherwise affirmed.

BOTEIN, J. P., and FRANK, J., concur with VALENTE, J.; BERGAN, J., dissents and votes to modify by dismissing the complaint and in other respects affirm, in opinion in which BASTOW, J., concurs.

Judgment modified to the extent of increasing it to the sum of $8,825.14, with interest from January 1, 1954, and in all other respects affirmed. Settle order on notice.